```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
WILLIAM HOGUE,                                              :
                                                            :   MEMORANDUM
                                                            :   DECISION AND ORDER
                            Petitioner,                     :
                                                            :   20-cv-1720 (BMC)
            - against -                                     :
                                                            :
SUPERINTENDENT OF GREEN HAVEN                               :
CORRECTIONAL FACILITY,                                      :
                                                            :
                            Respondent.                     :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

Petitioner seeks habeas corpus relief pursuant to 28 U.S.C. § 2254 from his state court conviction of first degree robbery and second degree criminal weapons possession for which, as a repeat felony offender, he was received an indeterminate sentence of 24 years to life. More facts will be set forth below as necessary to address petitioner's various points of error, but to summarize, this was a street robbery in which petitioner robbed the victim at gunpoint of some jewelry in front of his children. As petitioner entered and escaped by car, police officers heard shots fired, pulled over the fleeing vehicle, and arrested the driver and petitioner.

Petitioner raises four points of error: (1) he received ineffective assistance of trial counsel because, when the testimony at trial contradicted the arresting officer's testimony at the suppression hearing, counsel should have moved to reopen the suppression hearing; (2) the trial court violated petitioner's Sixth Amendment right to a jury trial by excusing potential jurors who identified themselves as unable to be fair and impartial based on the nature or type of charges, without follow-up questions; (3) petitioner's Fourth Amendment rights were violated based upon

the use at trial of his post-arrest recordings of telephone calls made while he was in custody; and (4) prosecutorial misconduct based on comments made during closing argument.

None of the arguments have merit, and the petition is therefore denied.

I.   **Ineffective assistance of counsel**

   A. Background

At a pretrial suppression hearing, Detective Kush Greene testified that, while driving an unmarked police car with his partner, Sergeant Eric Dargenio, in Brooklyn, he heard two shots behind him. He turned his head and saw "approximately two" muzzle flashes emanate from a tan Honda (the "Honda").[1] Det. Greene made a U-turn, and got behind the Honda. Det. Greene saw that the rear windshield of the Honda had a bullet or other hole and that petitioner was fiddling with the middle of the dashboard. Det. Greene began to follow the vehicle with lights and sirens. The Honda pulled over only after five or six blocks, and Det. Greene and his partner, guns drawn and pointing at the car, approached it. They yelled at the car's occupants to put their hands outside the windows of the car, and when the occupants complied, the police removed petitioner and the driver. Petitioner and the driver were placed under arrest on suspicion of illegal weapons possession.

Sgt. Dargenio searched the area for either a discarded gun or ballistics evidence, but did not find any. However, after Det. Greene drove the Honda to the local precinct, an inventory search of the passenger compartment, particularly the space where Det. Greene had observed

---

[1] Det. Greene referred to the car as "gold" at the suppression hearing, but there is no dispute that it was the same car later identified by the victim as "tan."

petitioner fiddling, disclosed a gun behind the vehicle's radio. The gun, which held nine bullets in its magazine and one in the chamber, had the capacity to hold eleven rounds.

Det. Greene did not know that the gunfire he had heard was in connection with a robbery until four or five days later, when the victim, Raymond Muscat, visited the precinct to report that he had been robbed in that precise area at the same time as petitioner's arrest. Muscat reported that a perpetrator unknown to him had confronted him and his family (young children and aunt) on the street, threatened them at gunpoint, and taken a gold chain and Rolex watch that he recently had taken to the jewelry store for a cleaning.

Muscat also reported that when he went to the jewelry store, the owner warned him that some people were asking about him and, upon leaving the store, Muscat observed that he was being followed by a black Maxima. Growing suspicious of this unwanted attention and beginning to fear for his safety, Muscat decided to ask an acquaintance for a favor – he needed a handgun for protection. After arriving at the agreed upon location to pick up the firearm, Muscat happened to see a gold Honda pull up. Muscat casually knew the driver of the Honda, but did not know the passenger.

Muscat told the police that immediately after the robbery, the robber had gotten into the Honda on the passenger side to escape. Muscat identified petitioner as the robber, picking him out from a series of photographs and then from a lineup. Upon searching the Honda for a third time, Det. Greene found Muscat's jewelry hidden in a deep space behind the dashboard where Det. Greene had first found the gun.

What Muscat did not tell Det. Greene during his initial interviews was that immediately following the robbery, Muscat had given chase to the Honda on foot and fired shots at it. Muscat first disclosed that information in his testimony before the grand jury that indicted petitioner (and

3

the driver). Det. Greene learned of Muscat's grand jury testimony before his (Det. Greene's) testimony at the suppression hearing. The suppression court found Det. Greene's testimony credible and held that there was probable cause for officers to stop and search the Honda and arrest the vehicle's occupants after he had heard gunshots, observed muzzle flashes coming from the car, and saw a bullet hole in the car.

At trial, Det. Greene's partner, Sgt. Dargenio, testified that although he had heard four or five gunshots behind their vehicle, he had not observed any muzzle flashes coming from the Honda. Similarly, Muscat testified that he was not aware of any shots coming at him from the Honda. Muscat's wife's aunt, Peggy Hobbs, who witnessed Muscat getting robbed, testified that she had heard "at least two gunshots" from about a block away after she fled the scene of the robbery with Muscat's two children.

On appeal, petitioner contended that based on the trial testimony of Sgt. Dargenio, Muscat, and Hobbs, petitioner's trial counsel was constitutionally ineffective for not seeking to reopen the suppression hearing to argue that there had been no probable cause to stop the car. Petitioner argued that the muzzle flashes to which Det. Greene testified at the suppression hearing were at the "heart" of the suppression court's ruling, and had the suppression court learned that three other witnesses did not testify to seeing muzzle flashes coming from the car, it would have found that the stop of the car was illegal and the contraband obtained from it was fruit of the poisonous tree.

The Appellate Division rejected this claim on the merits, holding:

> Counsel will not be deemed ineffective for failing to pursue an argument that has little or no chance of success. Here, the defendant did not establish that [Det. Greene's] hearing testimony was inconsistent with testimony elicited from other witnesses at trial, and it is unlikely that the Supreme Court would have granted an application to reopen the suppression hearing or that, if it had done so, it would

4

> have suppressed the physical evidence as a result. Accordingly, trial counsel was not ineffective for failing to make that application.

People v. Hogue, 166 A.D.3d 1009, 1010, 88 N.Y.S.3d 465, 467 (2nd Dep't 2018) (internal citations omitted), leave to appeal den., 32 N.Y.3d 1205, 99 N.Y.S.3d 248 (2019).

### B. Analysis

Because the Appellate Division decided this issue on the merits, my review is subject to the limitations of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 *et seq*. AEDPA permits reversal only if a state court's legal conclusion is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ." 28 U.S.C. § 2254(d)(1). The decision of a state court is "contrary" to clearly established federal law within the meaning of § 2254(d)(1) if it is "diametrically different" from, "opposite in character or nature," or "mutually opposed" to the relevant Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 405 (2000) (internal quotation marks omitted). A state court decision involves "an unreasonable application" of clearly established federal law if the state court applies federal law to the facts of the case "in an objectively unreasonable manner." Brown v. Payton, 544 U.S. 133, 141 (2005).

The Supreme Court has made clear that the AEDPA standard of review is extremely narrow, and is intended only as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal . . . ." Ryan v. Gonzales, 568 U.S. 57, 75 (2013) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 88 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Since

5

Harrington, the Supreme Court has repeatedly admonished Circuit Courts for not affording sufficient deference to state court determinations of constitutional issues. See, e.g., White v. Wheeler, 136 S. Ct. 456, 460 (2015) (quoting Burt v. Titlow, 571 U.S. 12, 19 (2013) ("This Court, time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'")).

In this case, petitioner's burden is doubly difficult because the standard for demonstrating ineffective assistance of trial counsel is itself very difficult to meet. The relevant test is set forth in Strickland v. Washington, 466 U.S. 668 (1984). Petitioner must first show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." Id. at 688. The Court must apply a "strong presumption of competence" and "affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." Cullen v. Pinholster, 563 U.S. 170, 196 (2011) (internal quotation marks and citations omitted). Second, under the "prejudice" prong, petitioner must also demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 669. "The likelihood of a different result must be substantial, not just conceivable." Harrington, 562 U.S. at 112. Moreover, as the Second Circuit has recently noted, "[t]he prejudice inquiry is . . . ineluctably tied to the strength of the prosecution's evidence." Garner v. Lee, 908 F.3d 845, 862 (2d Cir. 2018).

Other than Strickland's general precepts, petitioner's habeas counsel has not cited me to any Supreme Court authority, let alone Supreme Court authority that he contends is contrary to the Appellate Division's decision or which the Appellate Division unreasonably applied. By

failing to cite any Supreme Court authority other than the general test in Strickland, petitioner has argued himself into the additional restrictive principle that "[t]he more general the rule" at issue, "the more leeway [state] courts have in reaching outcomes in case-by-case determinations." Yarborough, 541 U.S. at 664.

Instead of pointing to Supreme Court authority, petitioner relies on an assumption that since Det. Greene was the only witness who testified to muzzle flashes, he was certainly lying, and since the receipt of false testimony constitutes a denial of due process, petitioner's trial counsel was ineffective for not seeking to reopen the suppression hearing. But I cannot draw the conclusion, contrary to that of the Appellate Division, that Det. Greene's different perspective necessitates a conclusion that he was untruthful.

The testimony that Sgt. Dargenio didn't see muzzle flashes, that Muscat did not observe muzzle flashes, and that Hobbs, from some distance away, heard gunshots, is not necessarily inconsistent with Det. Greene's testimony. This was an in-progress gunfight that was happening at rapid speed, with little time for any of the witnesses to carefully observe the events unfolding before them. A muzzle flash happens in a fraction of a second, and it may be that Det. Greene simply looked at the passenger side of the Honda at a moment in time where the other witnesses did not or from a perspective they did not have. Although it may be that Det. Greene misperceived two shots instead of one coming from the Honda, his testimony is corroborated by the fact that the gun found in the Honda was missing one cartridge; that Sgt. Dargenio heard four or five shots despite Muscat having fired only two or three; and that when Det. Greene turned around and got behind the Honda, he observed a punctured rear windshield.

Hobbs' testimony does not necessarily contradict Det. Greene's testimony. Hobbs had two young children with her, and her testimony made it clear that her priority after the robbery,

7

in which petitioner had just threated the family, was trying to get the children as far away from potential harm as quickly as possible. Therefore, she may well have not observed any muzzle flash because she was running away from the Honda – not because Det. Greene was lying.

There are thus several other explanations for the differences in the witnesses' testimony besides petitioner's argument that the differences ineluctably mean that Det. Greene was lying. Perhaps the other witnesses simply didn't see a muzzle flash. Perhaps there was a misperception on Det. Green's part. Or perhaps one or more of Muscat's shots generated a flash when it impacted the Honda. But like the Appellate Division, I cannot see how a court looking at these possibilities would likely determine to reopen the suppression hearing and then grant suppression.

Despite following the Honda with lights and sirens, it took five or six blocks for Det. Greene to get the Honda to pull over. And petitioner's fidgeting at the dashboard was suggestive of an effort at concealment (which it turned out to be). It certainly seems clear, at the very least, that Det. Greene and Sgt. Dargenio believed in good faith that some shots had come from the Honda. Otherwise, if the occupants of the Honda were the victims, the officers would have had no reason to approach the Honda with the guns drawn, yelling at the car's occupants to place their hands outside the windows.

Finally, although I agree with petitioner that the hearing court relied on the muzzle flashes to some extent, it should be noted that even without them, there was plenty of probable cause for the police to have stopped the Honda and arrest its occupants. The presence of shots, the erratic U-turn, the punctured rear windshield, petitioner's fidgeting with the dashboard, and the failure to pull over for at least five blocks were more than sufficient to constitute probable cause. Even without the muzzle flashes, the officers' reasonable belief that they had just

witnessed a drive-by shooting in which the occupants of the car were the perpetrators, not the victims, was supported by all of the circumstances.  See People v. Harris, 217 A.D.2d 666, 629 N.Y.S.2d 483, 484 (2nd Dep't 1995) (where police officers heard shots and saw a car approaching them with a passenger attempting to duck out of sight, the police had reasonable cause to stop the vehicle).

Petitioner did not demonstrate to the Appellate Division's satisfaction that his counsel was remiss in not seeking to reopen the suppression hearing or that suppression would have been granted.  Strickland does not require a trial attorney to make motions that are unlikely to succeed, see United States v. Arena, 180 F.3d 380, 396 (2d Cir. 1999), and petitioner has not demonstrated a reasonable possibility that such a motion would have succeeded.  Under the AEDPA standard of review, I can neither set aside the Appellate Division's conclusions that petitioner's trial counsel neither acted unreasonably nor can I find that petitioner was prejudiced.

## II.      Excusing jurors without adequate *voir dire*

Before commencing its individual *voir dire* of prospective jurors, the trial court read the prospective jurors a list of names that might come up in the trial and asked if any of the panel members knew any of the names.  Receiving no response, the trial court then advised the panel that "[t]he charges involved are robbery with a gun and also possession of a gun," and asked: "Is there anybody who just because of the nature of the charges feels like they could not be a fair and impartial juror?"  Twelve prospective jurors responded affirmatively, and after recording their names, the trial court excused them one at a time without further inquiry.  Defense counsel did not object to this procedure.

On appeal, petitioner argued that the excusal of the jurors based on their denial of the ability to be fair and impartial, without further inquiry, violated his right to a jury trial under the

9

Sixth Amendment. The Appellate Division rejected that argument, holding that "[t]he defendant's contention … is unpreserved for appellate review and, in any event, without merit." Hogue, 166 A.D.3d at 1010, 88 N.Y.S.3d at 467 (citations omitted).

This claim does not rise to the level of a constitutional violation. That is because the Sixth Amendment only guarantees petitioner a fair and impartial jury, not a jury of his choice. A petitioner can contend that the jury that convicted him was comprised of one or more biased jurors, but he cannot contend that the mere release of potential jurors deprived him *ipso facto* of an impartial jury. "The Sixth and Fourteenth Amendments of the U.S. Constitution state that a defendant has the right to a trial by an impartial jury." Oliveri v. New York, No. 07-cv-8262, 2010 WL 5620926, at *13 (S.D.N.Y. Dec. 29, 2010), report and recommendation adopted by, No. 07-cv-8262, 2011 WL 197240 (S.D.N.Y. Jan. 20, 2011) (internal citations omitted). But "if a defendant does not prove 'the partiality of the jury that ultimately convicted him, he may not successfully claim deprivation of his sixth amendment or due process rights.'" Oliveri, 2010 WL 5620926 at *13 (quoting United States v. Towne, 870 F.2d 880, 885 (2d Cir. 1989) (citations omitted)); see also United States v. Gonzalez, 339 F. App'x 400, 403 (5th Cir. 2009) ("Improper removal of a member of the venire is not grounds for reversal in a non-capital case unless the jurors who actually sat were not impartial within the meaning of the Sixth Amendment.") (citation omitted); cf. United States v. Martinez-Salazar, 528 U.S. 304, 315-16 (2000) (holding no due process violation occurs when a trial court refuses to excuse a juror for cause, and the defendant chooses to use a peremptory challenge against that juror). Petitioner does not suggest that there was anything about the excused prospective jurors indicating that they might have been disposed in his favor, or that they had some racial or religious commonality. Cf. Batson v. Kentucky, 476 U.S. 79 (1986) (peremptory challenges cannot be exercised on the basis of race).

10

And neither in his direct appeal nor in this proceeding has petitioner pointed to the seating of a single juror who was not fair and impartial. He therefore had the jury to which the Constitution entitled him.

In any event, the Appellate Division's holding that the argument was unpreserved creates a procedural bar to reviewing the claim on federal habeas corpus. A federal court should not address the merits of a petitioner's habeas claim if a state court has rejected the claim on "a state law ground that is independent of the federal question and adequate to support the judgment." Lee v. Kemna, 534 U.S. 362, 375 (2002) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)) (emphasis omitted). When a state court rejects a petitioner's claim because he failed to comply with a state procedural rule, the procedural bar may constitute an adequate and independent ground for the state court's decision. See, e.g., Coleman, 501 U.S. at 729-30; Murden v. Artuz, 497 F.3d 178, 191-92 (2d Cir. 2007). State procedural grounds are only adequate to support the judgment and foreclose federal review if they are "firmly established and regularly followed" in the state. Lee, 534 U.S. at 376 (quoting James v. Kentucky, 466 U.S. 341, 348 (1984)). Moreover, if a state court rejects a specific claim on an adequate and independent state law ground, then a federal court should not review the merits of the claim, even if the state court addressed the merits of the claim in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) (noting that state courts "need not fear reaching the merits of a federal claim in an *alternative* holding" because "[b]y its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law").

It is well-settled that New York's contemporaneous objection rule, codified at N.Y. Crim. Proc. Law § 470.05(2), is an independent and adequate state law ground that ordinarily precludes

11

federal habeas corpus review. See, e.g., Downs v. Lape, 657 F.3d 97, 104 (2d Cir. 2011). New York's contemporaneous objection rule provides that a party seeking to preserve a claim of error at trial must lodge a protest to the objectionable ruling "at the time of such ruling . . . or at any subsequent time when the [trial] court had an opportunity of effectively changing the same." N.Y. Crim. Proc. Law § 470.05(2). This rule has been interpreted by the New York courts to require, "at the very least, that any matter which a party wishes" to preserve for appellate review be "brought to the attention of the trial court at a time and in a way that gave [it] the opportunity to remedy the problem and thereby avert reversible error." People v. Luperon, 85 N.Y.2d 71, 78, 623 N.Y.S.2d 735, 739 (1995); see also People v. Hicks, 6 N.Y.3d 737, 810 N.Y.S.2d 396 (2005). Because petitioner's trial counsel never objected to the excusal of the prospective jurors, petitioner is procedurally barred from raising that argument here.

However, a procedurally barred claim can be reviewed in this Court if the petitioner can demonstrate cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. See Coleman, 501 U.S. at 750; Harris, 489 U.S. at 262. The latter avenue, a miscarriage of justice, is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. See Murray v. Carrier, 477 U.S. 478, 496 (1986). The first avenue, cause for the default and prejudice therefrom, can be demonstrated with "a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . that 'some interference by state officials' made compliance impracticable, . . . [or that] the procedural default is the result of ineffective assistance of counsel." Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994) (citing Murray, 477 U.S. at 488) (alteration in original). Although, in some circumstances, ineffective assistance of counsel can constitute "cause" sufficient to avoid a

12

procedural default, Murray, 477 U.S. at 488–89, the ineffective assistance claim must itself have been exhausted in the state court. Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000).

There is no cause or prejudice on this record, nor could there be. Petitioner never raised a claim for ineffective assistance of trial counsel for failing to preserve challenge the release of these jurors on direct appeal, and even if petitioner had raised the claim, the Appellate Division's alternative holding on the merits shows that such an argument would have failed because, in fact, it did fail. Since there is no exhausted claim of ineffective assistance, it cannot constitute cause for excusing the procedural bar.

Nor is there any manifest injustice resulting from this procedural bar. The evidence against petitioner was overwhelming. Again, petitioner cannot complain and has not complained about the impartiality of the jurors who convicted him. Petitioner's claim is therefore procedurally barred.

### III. Improper recording telephone calls from custody

Like all Rikers' Island inmates, petitioner's telephone calls while he was in pretrial custody were monitored and recorded. Petitioner received notifications of this policy. In some of the calls, petitioner used coded or guarded language, but nevertheless made significant admissions. The Department of Corrections turned the recordings over to the prosecution.

In pretrial hearings, petitioner's counsel objected to the introduction of portions of the calls as irrelevant or unduly prejudicial. Some and perhaps most of his objections on those grounds were sustained. He did not object on the ground that the monitoring, recording, or delivery of the recordings to the prosecution violated the Fourth Amendment. The portions allowed were received into evidence against petitioner at trial.

On direct appeal, petitioner contended that the recording and delivery of the calls to the prosecution violated the Fourth Amendment. He conceded that it was proper to record the calls, but argued that the consent was for purposes of institutional security, not prosecution. He acknowledged that the Second Department had recently rejected this argument in another case, People v. Diaz, 149 A.D.3d 974, 53 N.Y.S.3d 94 (2nd Dep't 2017), aff'd, 33 N.Y.3d 92, 98 N.Y.S.3d 544 (2019), but urged the Appellate Division to overrule its precedent.[2] The Appellate Division denied his claim on the merits:

> There is no merit to the defendant's contention that the recordings of his telephone calls from Rikers Island Correctional Facility were improperly admitted into evidence at trial. The defendant contends that the notice he received that his telephone calls would be monitored and recorded provided no basis to infer that he consented to the distribution of those recordings to the prosecution, and that any consent to the monitoring and recording of his calls was for the limited purpose of ensuring facility security. These contentions have been rejected by this Court [citing Diaz]. The defendant impliedly consented to the monitoring and recording of his telephone conversations by using the facility's telephones despite being notified that such calls were being monitored.

Hogue, 166 A.D.3d at 1010-11, 88 N.Y.S.3d at 467-48.

Petitioner seeks to reprise this argument in his habeas corpus petition, but it fails for at least two reasons. First, the issue is not cognizable on federal habeas corpus review. In Stone v. Powell, 428 U.S. 465 (1976), the Supreme Court held that federal habeas corpus review is unavailable for Fourth Amendment claims where the petitioner has had the opportunity to fully litigate the claim in state court: "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was

---

[2] The New York Court of Appeals' affirmance of Diaz was subsequent to the Appellate Division's decision on the issue in the instant case.

introduced at his trial." Id. at 494. The Supreme Court reasoned that, in the habeas context, "the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force." Id. at 494-95.

Based on Stone, the Second Circuit has held that habeas review of decisions implicating the exclusionary rule is limited to situations in which "the state provides no corrective procedures at all to redress Fourth Amendment violations," or where there is a corrective procedure "but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process . . . ." Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (*en banc*). Courts have repeatedly recognized that New York provides an adequate corrective procedure for Fourth Amendment claims. See, e.g., Capellan v. Riley, 975 F.2d 67 (2d Cir. 1992); Guzman v. Greene, 425 F. Supp. 2d 298 (E.D.N.Y. 2006); Crispino v. Allard, 378 F. Supp. 2d 393 (S.D.N.Y. 2005). For this reason, courts within this Circuit have almost uniformly held that challenges to a state court's rulings as to the application of the exclusionary rule are not reviewable under Stone. See, e.g., Marino v. Superintendent, Franklin Correctional Facility, No. 17-cv-1650, 2019 WL 1232088, at *4-5 (E.D.N.Y. March 15, 2019); Coleman v. Racette, No. 15-cv-4904, 2019 WL 948401, at *9-10 (S.D.N.Y. Feb. 2, 2019); Doll v. Chappius, No. 15-cv-6400, 2018 WL 6310191, at *9 (W.D.N.Y. Dec. 3, 2018); Wilson v. Graham, No. 17-cv-0863, 2018 WL 6001018, at *5-6 (N.D.N.Y. Nov. 15, 2018); Holley v. Cournoyer, No. 17-cv-587, 2018 WL 3862695, at *4-5 (D. Conn. Aug. 14, 2018); Ala v. Vermont, No. 10-cv-221, 2011 WL 1843045, at *4 (D. Vt. April 4, 2011).

Here, there is no question of the adequacy of the state law remedy. Notwithstanding his trial counsel's failure to preserve the issue, petitioner obtained a determination on the merits

from the Appellate Division, and used his opportunity under state law to raise it again by a leave application to the Court of Appeals. Under these circumstances, the state courts have provided petitioner a full and fair opportunity to raise his Fourth Amendment claim, and he has no right to federal habeas corpus review.

Second, even if I did review the claim, there is no Supreme Court precedent even remotely suggesting that the recording and use at trial of in-custody, non-privileged telephone calls violates the Fourth Amendment, and thus petitioner could not meet the narrow standard for AEDPA relief. Indeed, both the Second Circuit and the New York Court of Appeals have held that prisoners' recorded telephone calls can be used in their prosecution as long as the prisoner received notice that the call was going to be monitored. See, e.g., United States. v. Friedman, 300 F.3d 111, 122-23 (2d Cir. 2002); Diaz, 33 N.Y.3d 92, 98 N.Y.S.3d 544.

### IV.   Prosecutorial misconduct during summation

Finally, petitioner points to several statements by the prosecutor in closing argument that he contends deprived him of a fair trial: (1) the prosecutor referred to Muscat's wife's aunt, Hobbs, as a "hero" for protecting Muscat's children during the robbery; (2) he accused petitioner of giving false and concocted testimony to the grand jury; (3) he told the jury that it could be "confident" in convicting petitioner because petitioner "did it"; (4) he reminded the jurors that, during *voir dire*, they had promised that they would not "just ignore [Muscat]" or tell him "you don't count" and (5) he injected his opinion in the case by telling the jury that he "wanted" them "to do something about it." The Appellate Division held that petitioner's argument was "largely unpreserved for appellate review. In any event, a prosecutor has 'broad latitude' in responding to the defense counsel's summation. The comments at issue here constituted fair comment on

the evidence or were responsive to the defense's own summation." Hogue, 166 A.D.3d at 1011, 88 N.Y.S.3d at 468 (citations omitted).

Because the Appellate Division did not specify which objections to the closing argument were unpreserved, I will not impose a procedural bar but will instead review the Appellate Division's alternative holding that the claims were without merit. See Jimenez v. Walker, 458 F.3d 130 (2d Cir. 2006). That review is subject to the same constraints under AEDPA as described above.

Once again, petitioner's burden to show constitutional error is doubly difficult because he must not only meet the AEDPA standard, but the exacting showing that is required to demonstrate fundamental error in a closing argument. Under federal law, a prosecutor has wide latitude in making his closing argument. See United States v. Casamento, 887 F.2d 1141, 1189 (2d Cir. 1989). Even where a prosecutor has made improper comments in summation, habeas relief is not warranted unless those remarks rendered the trial, as a whole, "fundamentally unfair." Darden v. Wainwright, 477 U.S. 168, 181-83 (1986). To be entitled to habeas relief, a petitioner must show "that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (habeas relief is warranted only where the prosecution's claimed misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process").

Petitioner comes nowhere near to satisfying this demanding standard. It is significant that in the nearly forty pages of transcript of the prosecutor's closing argument, petitioner cannot find more than a dozen words on which to base his request for relief. And even as to those

17

words, there was nothing wrong with the prosecutor's summation. A prosecutor is allowed to stress circumstantial evidence that makes witnesses incredible or credible. He is allowed to argue that defendant is guilty of the crimes charged. And the fact that he mentioned the courage of Hobbs and the presence of Muscat's children was because the evidence showed that petitioner threatened to shoot the children if Muscat didn't turn over his jewelry, which the prosecutor also mentioned. If that description garnered sympathy or caused resentment towards petitioner among the jurors, it was because of petitioner's deliberate actions during the robbery, not because of the prosecutor's summation.[3]

Even if I was reviewing the Appellate Division's decision on this point *de novo*, it would have to be readily upheld. Under the AEDPA standard of review, the issue is not even close.

## CONCLUSION

The petition is denied and the case is dismissed. A certificate of appealability shall not issue as the petition raises no substantial constitutional issue. See 28 U.S.C. § 2253(c). Further, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**



U.S.D.J.

Dated: Brooklyn, New York
      July 24, 2020

---

[3] In any event, the Second Circuit have noted that to the extent a prosecutor steps over the line by invoking sympathy, the trial court's final instructions can cure those excesses. See, e.g., Chalmers v. Mitchell, 73 F.3d 1262, 1271 (2d Cir. 1996). Here, the trial court gave the standard instruction requiring the jury to not let itself be influenced by sympathy, as well as the instruction that closing arguments are not evidence, and that it was up to the jury, not the lawyers, to draw whatever inferences they thought were reasonable.